## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**LIAFOM, LLC and
AARON ABDELHAK,**

**Plaintiffs,**

**vs.**

**BIG FRESH PICTURES, BIG FRESH
PRODUCTIONS, JEFF OPPENHEIM
LLOYD CHREIN, LEO LEICHTER,
SANDI CASTRO, AND JOHN DOE**

**Defendants**

**AMENDED COMPLAINT**

**CIVIL ACTION NO. 2:2010cv00606**

**JURY TRIAL DEMANDED**

**MAY 18, 2011**

Plaintiffs, Liafom, LLC ("Liafom") and Aaron Abdelhak ("Abdelhak") bring this action on behalf of themselves, upon personal knowledge as to themselves and their activities, upon information and belief as to all other matters, and upon, *inter alia*, the investigation made by and through Plaintiffs' attorneys.

This action is to recover damages arising from Defendant Jeff Oppenheim's ("Oppenheim") theft, conversion, business fraud, and breach of contract, with respect to Liafom's property, in his personal capacity, in his capacity as partner in Big Fresh Pictures, and in his capacity as principal of Big Fresh Productions.

## PLAINTIFFS

1.      Liafom is a limited liability company incorporated in Delaware with its principal place of business located at 493 Teaneck Road, Teaneck, New Jersey 07666.  Liafom has five members, three live in New York, one lives in New Jersey, and one lives in California.

2.      Abdelhak is an individual who resides at 493 Teaneck Road, Teaneck, New Jersey 07666.  Abdelhak is the manager of Liafom.  Abdelhak is also the majority shareholder of Liafom, and the owner of all of Liafom's voting shares.


## DEFENDANTS

3.      Big Fresh Pictures is partnership that operates a New York film production business specializing in filmed entertainment.   During the period of June 2005 to June 2006, Big Fresh Pictures' principal place of business is unknown.  From July 2006 to June 2008, Big Fresh Pictures' principal place of business was at 12 West 37th Street, 4th Floor, New York, NY 10018.  At present, business address is unknown.  See, Exhibit A: Big Fresh Pictures Address. See, Exhibit B: Big Fresh Pictures Website 2008.

4.      Big Fresh Productions is a New York film production business specialized in commercial media and presentation training.  Big fresh Productions operates as a privately owned business.  During the period of June 2005 to June 2006, Big Fresh Pictures' principal place of business is unknown.  From July 2006 to August 2008, Big Fresh Productions' principal place of business was at 12 West 37th Street, 4th Floor, New York, NY 10018.  At present, no business address is provided.  See, Exhibit C: Big Fresh Productions Address.  See, Exhibit D: Big Fresh Productions Website 2008.

5.      Oppenheim is an individual, and is a partner in Big Fresh Pictures and the owner of Big Fresh Productions.  Oppenheim is believed to reside at 1641 3rd Avenue, #24K, New York, NY 10128.  See, Exhibit B:  Big Fresh Pictures Website 2008.

6.      From June 2005 through May 2008 (the "Production Period"), Big Fresh Pictures, Big Fresh Productions and Oppenheim, provided production services to Abdelhak and Liafom Exhibit E: Sample of Cancelled Checks.

7.      From June 2005 through June 2006, Oppenheim, Big Fresh Pictures and Big Fresh Productions shared the same office and telephone, 212-828-8661.  From June 2006 until through June 2008, Oppenheim, Big Fresh Pictures and Big Fresh Productions shared the same office at 12 West 37th Street, 4th Floor, New York, NY 10018.   That office was occupied solely by Oppenheim.  At present it is unknown whether that office is open.  See, Exhibits A and C: Common Office.

8.      From June 2005 through June 2006, Oppenheim, Big Fresh Pictures and Big Fresh Productions shared the same office and telephone, 212-828-8661.  That office was occupied by Oppenheim and he answered the phone.  From June 2006 through June 2008, Oppenheim, Big Fresh Pictures and Big Fresh Productions, shared a common telephone number 212-629-7595 x23.  That number rang in the office occupied by Oppenheim at 12 West 37th Street, 4th Floor, New York, NY 10018.  Subsequent to the Production Period, the Big Fresh Pictures' website no longer provides any office contact number.  The Big Fresh Productions website continues to provide the same contact number.  See, Exhibit F: Shared Telephone Numbers.  See, Exhibit G: Current Contact Information.

9.     Lloyd Chrein ("Chrein") is an individual and a partner in Big Fresh Pictures.  He is believed to reside at 562 West End Avenue, Apt 8C, New York, NY 10024.  See, Exhibit B:  Big Fresh Pictures Website 2008.

10.    Leo Leichter ("Leichter") is an individual and a partner in Big Fresh Pictures.  He is believed to reside at 4316 Marina City Drive, # 729, Marina Del Ray, CA 90292.  See, Exhibit B:  Big Fresh Pictures Website 2008.

11.    Sandi Castro ("Castro") is an individual and a partner in Big Fresh Pictures.  She is believed to reside at 220 East 72nd Street, New York, NY 10021.  See, Exhibit B:  Big Fresh Pictures Website 2008.

12.    John Doe is an individual that participated in the events described herein.  He is believed to be a principal or associate with Big Fresh Pictures or Big Fresh Productions.  His identity and residence are presently unknown.

13.    Oppenheim, Chrein, Leichter, Castro and Doe, are collectively referred to as the "Individual Defendants."

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over Plaintiffs claims under 28 U.S.C. § 1332 because of the diversity of citizenship of Plaintiffs, Defendants and the other members of Liafom, and because the matter in controversy exceeds the sum or value of $75,000.

15.    Venue in the District of New Jersey is proper because Plaintiffs reside in this district, in Bergen County; the Defendants transacted with customers resident in this district, in Bergen County; and much of the conduct complained of by Plaintiffs occurred in this district, in Bergen County.

## BACKGROUND AND FACTS

### LIAFOM

16.    Liafom is a limited liability company incorporated in Delaware with its principal place of business located at 493 Teaneck Road, Teaneck, New Jersey 07666.  Liafom has five members, three live in New York, one lives in New Jersey, and one lives in California.

17.    Liafom's operations are governed by the Liafom Operating Agreement.   See, Exhibit H:  Liafom Operating Agreement.

18.    Liafom is the owner of the film "Aaron Loves Kendra."  Liafom is also the owner of all associated properties, including but not limited thereto, all footage in whatever medium contained, any and all tax credits obtained and/or available for the production, all records and releases related to the production, all Lacie hard drives and other properties purchased for the production; such properties hereinafter collectively referred to as the "Production Properties." Abdelhak paid for and formerly owned the Production Properties.   Abdelhak contributed the Production Properties to Liafom.  See, Exhibit I:  Abdelhak Membership Certificate.

19.    Oppenheim is a member of Liafom.  Oppenheim received an ownership interest as consideration for his effort on behalf of the film, and in consideration thereof, he became a party to the Liafom Operating Agreement and contractually agreed to promote Liafom's interests and not take action against Liafom's interests.  See, Exhibit J: Oppenheim's "Membership Interest Certificate."  That Certificate states:

> You hereby subscribe to, and agree to be bound by, all of the terms and conditions of the Operating Agreement.  You further agree to (i) take any and all reasonable efforts to promote the interests of the Company, and (ii) that any action taken by a Member which is detrimental to the interests of either the Company or its Members shall constitute a breach of the Operating Agreement and shall result in forfeiture of that Member's Membership Interests.

20.    Oppenheim may be liable for the cost of this litigation, inclusive of attorney fees. The Liafom Operating Agreement, and the Membership Interest Certificates, requires the non-prevailing party in a dispute with respect to the parties' rights and obligations as set forth in the Membership Interest Certificate and in the Liafom Operating Agreement, to pay the legal and other expenses of the prevailing party.  Oppenheim's Membership Interest Certificate states:

> Attorneys' Fees. In the event of any controversy or dispute arises between the parties with respect to this Agreement the prevailing party or parties shall be entitled to recover from the non-prevailing party or parties' reasonable expenses, including, but not by way of limitation, attorney's fees.

## BIG FRESH PICTURES & PRODUCTIONS

21.    Big Fresh Pictures produces filmed entertainment for the internet, television and movie theatres.  Big Fresh Pictures has four principals, each of which is a defendant hereto, Jeff Oppenheim, Lloyd Chrein, Sandi Castro and Leo Leichter.

22.    Abdelhak hired Big Fresh Pictures.  In June 2005, Abdelhak sought a production company for his film "Aaron Loves Kendra."  Abdelhak was introduced to Oppenheim by a mutual friend, Daria Winter.  Oppenheim promoted himself as a partner in Big Fresh Pictures, an up and coming film production company that recently produced the film "My Happy Valentine." Oppenheim directed that film, and offered to direct "Aaron Loves Kendra."  Big Fresh Pictures then had only three partners, Oppenheim, Chrein and Leichter. [1]  Oppenheim described Chrein, his partner at Big Fresh Pictures, as valuable to the project owing to his experience with internet promotion and web design.

---

1.  At that time Castro was not a partner with Big Fresh Pictures.  The only other partner was Leo Leichter, and he was located in California.

23.    Oppenheim informed Abdelhak about New York City and New York state film production tax credits.  Oppenheim presented himself and Big Fresh Pictures as knowledgeable about the tax credits, as he and Big Fresh Pictures had obtained the credits for his prior film "Funny Valentine."  Oppenheim promised that Big Fresh Pictures would provide that service for "Aaron Loves Kendra."[2]

24.    Abdelhak was favorably impressed and contracted with Oppenheim to secure the film production services of Big Fresh Pictures for the purpose of producing the film titled "Aaron Loved Kendra."

25.    On June 3, 2005, Oppenheim submitted to Abdelhak a proposed budget from Big Fresh Pictures with an estimate of $16,585 for the initial round of filming.[3]  See Exhibit K: Initial Budget.  That budget has the header:

**Big Fresh Pictures**
**www.bigfreshpictutes.com**
**212.828.8661[4]**

**Estimate for "Wife Interview Video"**

26.    Abdelhak met with Oppenheim and Chrein on August 2, 2005.  At the meeting Abdelhak described the film to Chrein in more detail.  Chrein was positive about the film and described his services.  Subsequent to the meeting, Oppenheim again advocated that Chrein

---

2.  Oppenheim explained that owing to legal conditions and requirements not all expenditures would be eligible for the credits, but that he would seek and obtain those tax credits that were available.

3.  Oppenheim emailed the estimate to Daria Winter, the person who introduced him to Abdelhak.  Daria Winter emailed the budget to Abdelhak.

4.  From July 2005 to March 2006, Oppenheim used the telephone number 212-828-8661.

would be invaluable for web related promotion as well as building a website to promote the film.[5]

27.   Big Fresh Pictures presented itself as a general partnership.  During the Production Period, Big Fresh Pictures and Jeff Oppenheim presented Big Fresh Pictures as a general partnership not operating in entity form.  Big Fresh Pictures did not hold itself out on its public website, on The Internet Movie Database (the film industry database), or in any communications with Plaintiffs, as operating in the form of a legal entity, such as a corporation, limited partnership, limited liability company, or any other legal entity.  A recent detailed review of hundreds of correspondences found not one instance where Big Fresh Pictures is identified as a legal entity.  This presentation found further support in Oppenheim's instructions to pay three different parties without explanation (Oppenheim, Big Fresh Pictures and Big Fresh Productions), and Big Fresh Pictures sharing the same manager, office and telephone number with Big Fresh Productions.

28.   Big Fresh Productions presented itself as a sole proprietorship.   Big Fresh Productions produces commercial videos and film, and provides acting and presentation training.  Big Fresh Productions clients include many law firms seeking to improve their attorney's courtroom acting and presentation.   On the Big Fresh Productions website, Oppenheim is presented as the sole principal of Big Fresh Productions.  During the Production Period, Big Fresh Productions did not hold itself out as a corporation in correspondences with Plaintiffs, or on its public website or The Internet Movie Database (the film industry database).[6]   Further

_____

5.  Chrein operates a business that offers services of website design, hosting and promotion, and online advertising email marketing.  The website for that business is Chrein.com.

6.  A recent detailed review of the hundreds of correspondences between Liafom and the Defendants found two instances where Big Fresh Productions was identified as a corporation, i.e., Big Fresh Productions, Inc.  In every other communication, Big Fresh Productions is presented without such designation as a private business owned directly by Oppenheim.  The two instances were among hundreds of correspondences, and without attention being

supporting that characterization is Oppenheim's instructions to pay three different parties without explanation (Oppenheim, Big Fresh Pictures and Big Fresh Productions), and in Big Fresh Productions sharing the same manager, office and telephone number with Big Fresh Pictures.

29.    The Defendants shared the same office.  During the first 35% of the Production Period, Big Fresh Pictures and Big Fresh Productions shared the same telephone and likely office.  During the last 65% of the Production Period, Big Fresh Pictures and Big Fresh Productions were both managed by Oppenheim, out of the same one room office on the fourth floor of 12 West 37th Street in New York City.  Oppenheim's office had shared use of a communal conference room and bathroom; but was sufficient for only a single occupant.

30.    The Defendants shared the same telephone number.  During the first 35% of the Production Period, Big Fresh Pictures and Big Fresh Productions shared the same telephone number which rang on the desk of Oppenheim.  During the last 65% of the Production Period, Big Fresh Pictures and Big Fresh Productions each maintained a public website that provided the same and only contact telephone number, 212-629-7595, Ext. 23.   That number reached Oppenheim's one room office on the fourth floor of 12 West 37th Street in New York City.

31.    Big Fresh Pictures was the primary production company.  At all times throughout the Production Period, Oppenheim assured Abdelhak that Big Fresh Pictures and not Big Fresh Productions would be the production company credited on the film, and that Big Fresh Pictures would assist with fundraising and provide distribution services.

---

called to the "Inc."  Given the public presentation of Big Fresh Productions not designated a legal entity, those two correspondence instances without more were not sufficient to overcome the normative presentation of Big Fresh Productions as sole proprietorship and were not sufficient to put Plaintiffs on notice that Big Fresh Productions was a corporation.  The two "Inc." designations were found during a recent review of the records and were a surprise to Plaintiffs.

32.   Big Fresh Pictures is mentioned over 210 times in correspondences with Plaintiffs, and in other Production Properties.  The header of the initial bill presented by Oppenheim was captioned "Big Fresh Pictures."   See Exhibit K: Initial Budget.   A fundraising term sheet prepared by Oppenheim was captioned with the Big Fresh Pictures name and logo.  See, Exhibit L: Big Fresh Pictures Term Sheet.  Abdelhak wrote checks to Big Fresh Pictures.  See, Exhibit C:  Cancelled Checks.  Oppenheim periodically provided Abdelhak with copies of Aaron Loves Kendra edits on DVD.  They all credit Big Fresh Pictures on screen as the production company for the film.  Oppenheim instructs the person responsible for on film credits to credit Big Fresh Pictures as the production company for the film.  See Exhibit M:  Oppenheim Instructs Credits. Stephen Treadway, the cinematographer of the film, states in his resume posted online that Aaron Loves Kendra was produced by Big Fresh Pictures.  See, Exhibit N: Resume of Stephen Treadway.  An actor involved in the production identified Big Fresh Pictures as the production company for the film on their online resume.  See, Exhibit O:  Actor Resumes.  In the four and a half year of correspondence between Plaintiffs and Oppenheim there is not a single instance where Oppenheim gives any indication other than that Plaintiffs were in fact clients of Defendant Big Fresh Pictures.  Thereafter, when fired, Oppenheim writes from home to deny that Big Fresh Pictures is responsible for the film.

33.   Big Fresh Productions was the ancillary production company.  In correspondences with Plaintiffs, and in other Production Properties, Big Fresh Productions is mentioned over 25 times.  Big Fresh Productions is mentioned over 25 times in correspondences with Plaintiffs, and in other Production Properties.  Big Fresh Productions provided Plaintiffs with a fund raising term sheet on Big Fresh Productions letterhead.  See Exhibit P:  Big Fresh Productions Budget and Bill.  There are canceled checks from Plaintiff made out to Big Fresh Productions.  See,

Exhibit E:  Cancelled Checks.  Oppenheim posted a casting call under the name of Big Fresh Pictures.  See, Exhibit Q:  Big Fresh Productions Casting Call.  The IMDB profile for "Aaron Loves Kendra," as prepared by Oppenheim refers to "Big Fresh Productions" as the production company for the film.  See, Exhibit R:  IMDB Profile.  Persons working on the film credited Big Fresh Productions as the production company.  See, Exhibit S: Dolinger Resume.  In the four and a half years of correspondence between Abdelhak and Oppenheim there is not a single instance where Oppenheim gives any indication other than that Plaintiffs were if fact contracting with Defendant Big Fresh Productions.  Thereafter, when fired, Oppenheim writes from home to deny that Big Fresh Productions is responsible for the film.

34.   Oppenheim instructed Abdelhak to pay by checks or wire transfer to Big Fresh Pictures, Big Fresh Productions, third-party vendors, and Jeff Oppenheim.  Oppenheim said this was required for accounting reasons and because Big Fresh Productions would provide much of the production work.  Oppenheim confirmed that Big Fresh Pictures would be the production company credited on the film and would provide funding assistance and distribution services.  Abdelhak paid approximately $165,000 between June 2005 and February 2008 for production services.[7]  Abdelhak was not concerned about the arrangement as Oppenheim was a partner in Big Fresh Pictures and the principal of Big Fresh Productions.

---

7.   In January 2007, Abdelhak suffered a severe hand injury requiring surgery, rehabilitation and at the time, potentially further surgery.  Abdelhak informed Oppenheim that the film would have to be put on hold indefinitely. Abdelhak paid $30,000 to Oppenheim as remuneration should the film not be completed and his director credit not be forthcoming.  Abdelhak was not legally required to make that payment, but did so because he felt it the fair and moral thing to do.  The acknowledgement of the beneficent payment is recorded in a letter of thanks from Oppenheim to Abdelhak.  See, Exhibit T:  Oppenheim's thank you Letter.

## LIAFOM FIRES DEFENDANTS

35.    As described below, Abdelhak fired Big Fresh Pictures, Big Fresh Productions, and Oppenheim in April 2008.[8] Oppenheim responded by removing the Production Properties film footage from the Lacie hard drives owned by Liafom, and transferring the Production Properties film footage to another medium, secured to himself. Oppenheim then denied that Defendants Big Fresh Pictures and Big Fresh Productions were responsible for producing the film.  Big Fresh Pictures and Big Fresh Productions have assets; it is unknown whether Oppenheim does.  A detail of the events follow.

36.    In June 2007 Abdelhak informed Oppenheim that he was in position to go forward with completing the film and that he would undertake to seek funding from investors for production and post-production costs.  In June and July of 2007, Oppenheim advocated that in the interest of time Abdelhak finance the final production and post production costs.  As an inducement for Abdelhak agreeing to self finance the final filming, Oppenheim promised to personally provide his own post-production services at no cost so that the film may be complete in six to eight weeks thereby making the film ready for the 2008 film festival circuit.  Abdelhak agreed and kept his half of the bargain; shooting was completed September 9, 2007.

37.    Oppenheim did not deliver on his commitment.[9]  During the period of July 2007 through November 2007, Abdelhak was repeatedly disappointed with Oppenheim's conduct and performance.  Abdelhak found Oppenheim to be affected in some manner, and to differ from the organized, measured and stable person that he experienced prior.  Oppenheim was now ill

---

8.  Abdelhak fired Defendants by communication to Oppenheim.

9.  Oppenheim delayed delivery and then spent his time experimenting with what he believed was an innovative editing technique for which he would receive recognition and acclaim.  Oppenheim did not edit the film as required. Oppenheim then suggested that Abdelhak hire an editor to do the work.

prepared, and cavalier about his obligations and commitments.  Oppenheim did not keep his commitment to provide his own post-production services so that the film may be complete in six to eight weeks without further cost.

38.   In December 2007 and January 2008, Oppenheim and other individuals who contributed personal efforts in the making of the film, each received a minority interest in Liafom as evidenced by a Membership Interest Certificate.[10]   That Membership Interest Certificate also delineated member's rights and obligations, and bound the member to the terms of the Liafom Operating Agreement.  See, Exhibit H: Liafom Operating Agreement; and Exhibit J: Membership Interest Certificate signed by Oppenheim.  The Liafom Operating Agreement memorializes that Liafom owns 100% of the film properties of "Aaron Loves Kendra."

39.   In April 2008, Abdelhak informed Oppenheim that the services of Defendants Big Fresh Pictures and Big Fresh Productions were no longer required, and instructed Oppenheim to transfer the film properties to another production company, UrbanMouse Productions. Specifically, Abdelhak instructed Oppenheim to transfer the film properties to Ms. Goff of UrbanMouse Productions. Abdelhak described to Oppenheim his due diligence of UrbanMouse Productions by talking to UrbanMouse Productions' former clients.  Abdelhak offered to provide the reference contact information to Oppenheim.  Oppenheim passed.  During the period leading up to the point of transfer, Oppenheim had a number of conversations with Ms. Goff wherein he was free to diligence Ms. Goff.  Oppenheim passed.

40.   In a number of conversations between Leslie Goff of UrbanMouse Productions and Oppenheim, Oppenheim described the film properties for "Aaron Loves Kendra" in his possession, including the portable Lacie hard drives which contained the film footage.

---

10. Abdelhak made the commitment to grant the membership interests prior to Oppenheim's bad conduct in July through November 2008.  Notwithstanding Oppenheim's bad conduct, Abdelhak delivered on his commitment to grant Oppenheim the membership interest.

Oppenheim agreed that the transfer of the film footage and other film properties to UrbanMouse Productions.  The initial transfer date had to be cancelled and the transfer date was rescheduled to May 15, 2008.  The transfer was to take place at the offices of Big Fresh Pictures and Big Fresh Productions, on the fourth floor of 12 West 37th Street in New York City.  Leslie Goff subsequently informed Oppenheim that owing to a schedule conflict, her business colleague and associate, Aram Bauman of UrbanMouse Productions, would pick up the properties on May 15, 2008.  Oppenheim agreed to transfer the properties to Aram Bauman.

41.   On May 15, 2008, Aram Bauman of UrbanMouse Productions went to the offices of Big Fresh Pictures and Big Fresh Productions to pick up the film properties.  Oppenheim and John Doe, an unknown associate, declined to transfer the Production Properties to Aram Bauman.  Oppenheim confessed to Aram Bauman that he had removed the film footage off the Liafom owned portable Lacie hard drives and transferred the film footage to some other non-transferable medium.  Oppenheim did not have Liafom's consent to make that transfer.

42.   After refusing transfer, Oppenheim did not contact Abdelhak.  Liafom counsel sent two emails and a letter demanding explanation from Oppenheim.[11]  Oppenheim responded to those correspondences with non-responsive letters describing his hurt feelings and demanding documentation so he could take the instructions to transfer "under advisement."  The letters were written from his home address, and copied to two attorneys he knows, in which he denied the responsibility of Big Fresh Pictures and Big Fresh Productions for the film, and insinuated threat of making recovery of the Production Properties litigious.  Those two letters were the sole

---

11. The emails and the letter were written by Michael M. Cohen, Esq., counsel for Liafom, and were addressed to Oppenheim, Big Fresh Pictures and Big Fresh Productions, at their offices on the fourth floor of 12 West 37th Street in New York City.  The correspondences requested explanation from Oppenheim of his removing the film footage from Liafom's Lacie drives and his refusal to transfer the Production Properties and that Oppenheim stand ready to make arrangement for a transfer.  The correspondences stated that his actions were in violation of his agreement with Liafom and would result in, among other things, a forfeiture of his Liafom membership interest, and demanded that Oppenheim contact Mr. Cohen to arrange transfer of Liafom's property to its designee.

instances in four years of communication on the project that Oppenheim used his home address.[12]  See, Exhibit U:  Correspondences Regarding Return of the Production Properties.

43.     In his non-responsive letters written from home, Oppenheim described himself as a partner of Abdelhak.  There are four years of comprehensive correspondences between Abdelhak and Oppenheim, Big Fresh Pictures and Big Fresh Productions, regarding Big Fresh Pictures and Big Fresh Productions acting as production companies for the film "Aaron Loves Kendra." There is no correspondence or other record of any partnership between Oppenheim and Abdelhak.  See, Exhibit U:  Correspondences Regarding Return of the Production Properties.

44.     In his non-responsive letters written from home, Oppenheim did not admit or deny that he refused to turn the Production Properties over to UrbanMouse Productions, or that he violated the Liafom Operating Agreement, or that he was in illegal possession of the Production Properties, or any of the other claims made by Counsel for Liafom against him.  Oppenheim simply refused to return the Production Properties to Liafom, and refused to explain his conduct; and insinuated threat to make legal recovery of the Production Property litigious.  See, Exhibit U:  Correspondences Regarding Return of the Production Properties.

45.     Oppenheim believes that two letters written from his home address will now overcome four years of correspondences from the offices of Big Fresh Pictures and Big Fresh Productions, at 12 West 37th Street, 4th Floor, New York, NY 10018.

46.     Oppenheim believes that sending letters by certified mail transform the crimes of theft, conversion and fraud, into a contract dispute.

47.     Oppenheim believes that copying letters to counsel transform the crimes of theft, conversion and fraud, into a contract dispute.

---

12.  Prior thereto the only address associated with the film "Aaron Loves Kendra" was 12 West 37th Street, 4th Floor, New York, NY 10018.

48.   Oppenheim believes that his hurt feelings and inane demands for documents transform the crimes of theft, conversion and fraud, into a contract dispute.

49.   At present, Oppenheim is employed by Lifestyle Communications.  His resume on the Lifestyle Communications website does not mention the film "Aaron Loves Kendra." Oppenheim continues to re-write his past to suit his present.  See, Exhibit V:  Oppenheim Bio on Lifestyle Communications Website.

## COUNT ONE
## BREACH OF CONTRACT

50.   Plaintiffs, repeats each and every allegation stated above as though set forth herein at length.

51.   Defendants were bound to a contract with Liafom for production services.

52.   Defendants breached their contract with Liafom by failing to complete the film.

53.   Defendants breached their contract with Liafom by failing to follow Liafom's production instructions.

54.   Defendants breached their contract with Liafom by failing to turn over the Production Properties to UrbanMouse Productions.

55.   Defendants breached their contract with Liafom by withholding the Production Property from Liafom, and by removing the Production Properties film footage from Liafom's Lacie hard drives onto its own media.

56.   Big Fresh Pictures and Big Fresh Productions breached their production contracts and Oppenheim breached the terms of his Liafom Operating Agreement by:[13]

---

13.   Oppenheim was contractually bound to Liafom, and to act in Liafom's best interests, consequent to his signing the Liafom Operating Agreement.

(a)    Failing to follow Liafom's production instructions.

(b)    Failing to turn over the Production Properties to UrbanMouse Productions.

(c)    Retaining Liafom's property for their own use.

(d)    Moving Liafom's property off Liafom's hard drives.

(e)    Taking actions detrimental to the interests of Liafom.

(f)    Failing to file for and obtain New York City and New York State film production tax credits.


57.    Defendants are being sued for missing New York City and New York State film tax credits.[14]  The Defendants either received the tax credits from New York City and New York State, and never turned such funds over to Abdelhak or Liafom, or the Defendants negligently failed to file for and obtain the credits.   In either case, the Defendants are required to make Liafom whole for the dollar value of the lost or stolen tax credits.

58.    The Defendant's are being sued for approximately $12,350 of post-production work that the Defendants were obligated to provide and did not.

59.    The Defendant's are being sued for approximately $15,350 of incremental costs to complete the film owing to the required inventoried transfer to a new production company and the new production company's detailed review of the Production Materials.

60.    The Defendant's are being sued for $8,750 in legal fees and other expenses incurred by Liafom to remedy the criminal conduct of the Defendants and recover the Production Properties.  Such expenses include the review and organization of five years of Liafom's records and correspondences, and the drafting and filing of this complaint.

---

14.  A calculation by a qualified accountant with experience in film production is required to determine the exact amount.

61.   Oppenheim is also being sued $8,750 separately, as signatory to the Liafom's Operating Agreement, wherein he agreed to pay legal and other expenses incurred by Liafom, to address his bad conduct.  See, Exhibit H: Liafom Operating Agreement, Section 11.18.  See also, Exhibit I: Membership Interest Certificate signed by Oppenheim.

62.   Alternatively, the Defendants are being sued for the market value of the film "Aaron Loves Kendra."  The market value of a complete film is determined by its quality and appeal.  That market value can substantially exceed the cost of its production.[15]  Liafom's estimate of the market value of Aaron Loves Kendra is between $700,000 and $1,250,000.  Liafom requests the value of the Production Properties to be determined by an independent third-party appraisal.

63.   Damages for Count One are in the amount of $36,450, plus the dollar value of lost New York City and New York State tax credits.  Alternatively, damages are the value of the Production Properties, presently estimated between $700,000 and $1,250,000.


## COUNT TWO
## CONVERSION AND THEFT

64.   Plaintiffs, repeats each and every allegation stated above as though set forth herein at length.

65.   Liafom owns and has the right to possess the Production Property, presently in the possession of Defendants.

66.   The Defendants intentionally interfered with Liafom exercising dominion and control over the Production Properties, by refusing to transfer such property to Liafom or its

---

[15]. For example, this year the film Paranormal Activity was produced for $15,000, yet it went on to theatrical release and grossed $123,000,000.  As published by Box Office Mojo, which tracks business statistics relevant to the film industry.

designee, by removing the Production Property film footage off the portable Lacie drives owned by Liafom, and transferring the film footage to some other medium they control, and by securing use of Liafom's Production Properties for themselves.

67. Such use and interference deprived Liafom of possession and use of the Production Property.

68. The Defendants' interference and possession of Liafom's property caused damages to the plaintiff owing to the delay in completing "Aaron Loves Kendra," costs and expenses to recover the Production Properties and the additional cost to complete the film.

69. The Defendants have wrongfully retained and converted goods belonging to Liafom valued at least $700,000 and at most $1,250,000. Liafom requests the value of the Production Properties to be determined by an independent third-party appraisal.

**COUNT THREE**
**BUSINESS FRAUD**

70. Plaintiffs repeat each and every allegation stated above as though set forth herein at length.

71. During the course of the Production Period, Oppenheim represented that Liafom was dealing with Big Fresh Pictures and Big Fresh Productions. In fact, correspondences from Oppenheim came under the names of Big Fresh Pictures and Big Fresh Productions interchangeably.

72. During the course of Liafom's relationship with Oppenheim, Liafom paid checks to all three of, Oppenheim, Big Fresh Pictures and Big Fresh Productions. See, Exhibit E: Cancelled Checks.

73.   Oppenheim's management of both Big Fresh Pictures and Big Fresh Productions from the same office and by use of the same telephone number, enabled Oppenheim to play a shell game making representations for one or both companies and for himself personally.  Such representations were material since Abdelhak would otherwise never have entrusted his film to Oppenheim.   In fact, Oppenheim's now claim that Abdelhak was only dealing with him personally would have been a non-starter.   Who would hire a person that had two film production companies and that would commit neither to the production?

74.   Big Fresh Pictures and Big Fresh Productions and the Individual Defendants knew that Liafom was being given false and misleading information.

75.   Big Fresh Pictures and Big Fresh Productions and the Individual Defendants intended on Liafom relying on such representations as they wanted Liafom to contract with them for film production purposes.

76.   Plaintiffs were ignorant of the falsity of the representations of Big Fresh Pictures and Big Fresh Productions and the Individual Defendants.

77.   Plaintiffs had a right to rely on the representations of Big Fresh Pictures and Big Fresh Productions and the Individual Defendants.

78.   Abdelhak did rely upon the representation of Big Fresh Pictures, Big Fresh Productions and the Individual Defendants, and was induced to contract with the Defendants for film production services.

79.   Liafom's damages were consequently and proximately caused by Plaintiffs' reliance on the representations of Big Fresh Pictures, Big Fresh Productions and the Individual Defendants.

80A.   Damages for Count One are in the amount of $36,450, plus the dollar value of lost New York City and New York State tax credits.  Alternatively, damages are the value of the Production Properties, presently estimated between $700,000 and $1,250,000.

80B.   Defendants Leo Leichter, Sandi Castro and Lloyd Chrein acted independently and conspired with each other and Mr. Oppenheim to withhold and deprive Plaintiff of his property. Defendants furthered their conduct by denying the existence of the business entity Big Fresh Pictures and their being general partners or other type of partners in that business. Defendants Leo Leichter, Sandi Castro and Lloyd Chrein acted independently and conspired with each other and Mr. Oppenheim to defraud and attempt to defraud plaintiff by whole cloth denial of their involvement directly and indirectly with his properties and the facts that would support their legal obligations to him, and making recovery of his property precarious by leaving it in the hands of their bankrupt partner.


**COUNT FOUR**
**PERSONAL LIABILITY**

80.   Plaintiffs repeat each and every allegation stated above as though set forth herein at length.

81.   Big Fresh Pictures failed to provide contracting parties or the public with notice on their website, the Internet Movie Database, or in correspondence, of the existence of any entity that would limit the liability of the partners and owners.  See, Exhibit B: Big Fresh Pictures Website.  See, Exhibit R:  Big Fresh Pictures IMDB.

82.   Big Fresh Productions failed to provide contracting parties or the public with notice on their website, the Internet Movie Database, or in correspondence, of the existence of any

entity that would limit the liability of the partners and owner.[16]   See, Exhibit D: Big Fresh Productions Website.  See, Exhibit R:  Big Fresh Productions IMDB.

83.    The partners of Big Fresh Pictures do not append to the Big Fresh Pictures name any entity designation.  The partners of Big Fresh Pictures did not otherwise provide public notice on their website or on the Internet Movie Database, the film industry database, of being a legal entity.  The partners Big Fresh Pictures did not provide notice of being a legal entity in correspondences to Plaintiffs.  The partners of Big Fresh Pictures are now estopped from asserting a defense of limited liability.

84.    The owner Big Fresh Productions did not append to the name a required designation for a legal entity. The owner of Big Fresh Productions did not otherwise provide public notice on his website or on the industry database of being a legal entity.  The owner of Big Fresh Productions did not provide adequate notice in correspondences to Plaintiffs.  The owner of Big Fresh Productions is estopped from asserting a defense of limited liability.

85.    Oppenheim, Chrein, Leichter and Castro are liable for The Individual Defendants are personally liable for the actions of Big Fresh Pictures.

86.    Oppenheim is personally liable for the acts of Big Fresh Productions.

## COUNT FIVE
## PIERCING THE CORPORATE VEIL

87.    Plaintiffs, repeats each and every allegation stated above as though set forth herein at length.

---

16.  A detailed review of all correspondences found two instances where the "Inc." designation was appended to the name of the company.  In both cases nothing was mentioned of the designation.  Those instances were contrary to the 25 or more instances where there was no such designation.  That absent anything more was insufficient to provide sufficient notice.  The finding of the two instances was a surprise to Plaintiffs and Counsel.  Absent looking for the two designations they would have remained unknown.

88.   Upon information and belief, based upon conduct of Oppenheim using the entities in his shell game, treating them as personal pawns, maintaining a single office and telephone number for both, and denying their contracts and obligations, Big Fresh Pictures and Big Fresh Productions:

i. Do not have corporate officers other than the Individual Defendants.

ii. Do not have corporate books of account.

iii. Were not adequately capitalized at their formation to engage in the businesses for which it was formed.

iv. Were undercapitalized with the intent of avoiding obligations bound to arise as a result and in course of their operations.

v. Are either currently or soon to be out of business and cannot or will not be able to pay their debts.

vi. Has been stripped of their assets and those assets have been appropriated for the personal use of their shareholder(s).

vii. The shareholder(s) continually drained all income out of Big Fresh Pictures in disregard of Big Fresh Pictures' independent corporate existence.

viii. Have failed to adhere to the formalities of corporate existence in that they failed to keep adequate records relating to governance of their corporate affairs and accounting of their finances.

ix. Have failed to adhere to the formalities of corporate existence in that they failed to issue any share certificates to their shareholder(s).

x. Has failed to adhere to the formalities of corporate existence in that they failed to obtain from their shareholder(s) any capital contribution in return therefrom, and in that they failed to retain, before distribution to the shareholder(s), earnings from their operations in an amount sufficient to meet their financial obligations.

xi. Shared common equipment, personnel, property, and utilities with each other and neither paid the other for the use of such.

xii. The shareholder(s) failed to maintain the independent identity of Big Fresh Pictures and completely dominated, controlled, and conducted the businesses of Big Fresh Pictures in disregard of its corporate formalities and in a manner that suited their own personal conveniences.

xiii. The partners of Big Fresh Pictures set up Big Fresh Pictures as a mere instrumentality for their personal use.

xiv. The partners(s) wrongfully kept funds due and owing to Liafom.

89.  By virtue of the foregoing, Big Fresh Pictures was the alter ego of its shareholders/partners and the Individual Defendants.

90.  By virtue of the foregoing, Big Fresh Pictures and Big Fresh Productions were interchangeable alter egos of each other.

91.  In view of the Individual Defendants disregard of the corporate formalities of Big Fresh Pictures' separate existence, an adherence to the fiction of an independent corporate existence of Big Fresh Pictures would result in injustice to the Plaintiff.

92.  By reason of the foregoing, the owners of Big Fresh Pictures are not entitled to entity level protection.

93.  By reason of the foregoing, this Court should pierce the entity veil of Big Fresh Pictures.

94.  By reason of the foregoing, this Court should pierce the entity veil of Big Fresh Productions.

95.   Based upon the foregoing, Big Fresh Pictures, Big Fresh Productions, and the Individual Defendants are each liable to Liafom for the debts of both Big Fresh Pictures and Big Fresh Productions and are therefore personally jointly and severally liable to Liafom for damages.

## RELEIF SOUGHT

96.   **WHEREFORE**, Plaintiffs requests that the Court grant the following relief in its favor and against the Defendants for:

97.   An Order piercing any entity veils of Big Fresh Pictures and Big Fresh Productions, and imposing personal liability on the Individual Defendants.

98.   An Order directing Defendants to pay Liafom the market value of the Production Properties as determined by an independent third-party appraisal.

99.    Alternatively, an award to be determined at trial no less than $36,450, plus the dollar value of lost or misappropriated New York City and New York State film production tax credits.

100.  An Order directing Defendants to transfer the Production Properties to Liafom or its designee in an orderly and inventoried manner, wherein the Production Properties are inventoried.[17]

101.  An Order declaring Oppenheim in breach of his obligations to Liafom and forfeiting his financial interests in Liafom.

102.  An award of Attorneys' fees and expenses.

103.  Granting the Plaintiffs such other and further relief as this Court deems just and proper.

---

17.  That inventory is to confirm that all required releases from persons onscreen are delivered in proper effective condition, that all of the film footage is delivered in good condition, etc.

104.  Plaintiffs demand a jury trial on all of the foregoing counts.

Signed in Englewood, New Jersey, this Eighteenth day of May, 2011:

_____

Michael M. Cohen, Esq.
275 Walton Street
Englewood, New Jersey 07631
T (201) 227-0881
F (201) 227-0882
Attorney for Plaintiffs
MC 2254